## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

—————————————————————

UNITED STATES OF AMERICA *ex rel*.
SHANTAE M. WYATT and
LATOYA SPARROW,                                    Hon. Carol Sandra Moore Wells
          *Plaintiff*,                                United States Magistrate Judge

    v.

BIOTEK REMEDYS, et al.                    Civ. Action No. 19-cv-6069-CSMW
         *Defendants*.

—————————————————————


## DECLARATION OF DAVID BOCIAN IN SUPPORT OF
## MOTION FOR ATTORNEYS' FEES, COSTS AND EXPENSES

I, David Bocian, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.　　　I am a member in good standing of the bars of the Commonwealth of Pennsylvania, the State of New Jersey, the State of New York, and the District of Columbia, and I am admitted to practice before this Court. I have personal knowledge of the facts set forth herein, based upon my supervision of, and participation in, the prosecution and resolution of this matter.

2.　　　I respectfully submit this Declaration in support of the Motion for Attorneys' Fees, Costs and Expenses (the "Motion") pursuant to Rule 54 of the Federal Rules of Civil Procedure and the fee shifting provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730(d). For the reasons discussed below, I, on behalf of Kessler Topaz Meltzer & Check, LLP, respectfully submit that the attorneys' fees, costs and expenses requested in the Motion are reasonable.

3.　　　I am a partner in the law firm of Kessler Topaz Meltzer & Check, LLP ("KTMC"), and since 2013, I have overseen KTMC's Whistleblower practice group, where my practice is dedicated to representing whistleblowers in cases brought under the FCA and analogous state statutes, as well as through financial fraud whistleblowing programs at the U.S. Securities and Exchange Commission, the Commodity Futures Trading Commission, and the Internal Revenue Service. I am additionally a member of KTMC's Securities Fraud litigation group, where I litigate complex securities fraud class actions with an emphasis on those related to the pharmaceutical, health care, and life science industries.

4.　　　For more than a decade, I served as an Assistant U.S. Attorney in the District of New Jersey, where I was appointed Senior Litigation Counsel and managed the Trenton U.S. Attorney's Office. Among other things, I oversaw complex investigations involving government corruption and federal program fraud; commercial and public sector kickbacks; government

contractor fraud; tax fraud; and, other white collar and financial crimes. As an Assistant U.S. Attorney, I tried numerous cases to verdict. Prior to my tenure in the U.S. Attorney's Office, I was employed in the litigation practice of a major Washington, D.C. law firm.

5.      I have additional specialized experience in health law and regulation. I was previously employed in the healthcare industry, where I was responsible for a system-wide compliance program at a New Jersey based health system. I have also served as an adjunct professor of law at Rutgers Law School where I taught a course on healthcare fraud and the FCA, entitled "Healthcare Fraud and Abuse," and last year, on the Foreign Corrupt Practices Act.

6.      I graduated from the University of Virginia School of Law in 1998 and *cum laude* from Princeton University in 1992.

7.      KTMC represents Relators Shantae Wyatt and Latoya Sparrow ("Relators") in the above-captioned matter (the "Action").

8.      This Action was resolved by settlement between the United States, Relators and Defendants BioTek and Gadde for $20 million (not including interest). A copy of the Settlement Agreement is attached as Exhibit A (the "Settlement").

9.      During the course of representing Relators, KTMC provided the following legal services, among others, over the course of the representation: (i) interviewing the Relators and investigating the allegations of fraud; (ii) conducting legal research regarding the allegations, including related to specialty pharmacies and violations of the AKS pertaining to routine waivers of copayments; (iii) investigating the Defendants' business practices; (iv) reviewing and analyzing the documentary evidence provided by Relators; (v) drafting and filing the Complaint; (vi) drafting and submitting the written disclosure of material evidence required under the FCA ("Disclosure Statement"); (vii) preparing for and participating in the United States' interviews of the Relators;

(viii) preparing and submitting supplemental disclosures of material evidence and analyses to the United States; (ix) engaging in extensive analysis of documentary evidence produced by Defendants and shared with counsel by the United States pursuant to a sharing agreement; (x) drafting and filing the Amended Complaint; (xi) participating in numerous status and settlement conferences with the Court; (xii) preparing for and engaging in settlement discussions with Defendants and the United States; and (xiii) preparing the present motion.

10.     I believe that Counsel's efforts resulted in an excellent outcome for the United States and for the Relators in this unusual and complex kickback case.  By the terms of the Settlement Agreement, the United States will recoup more than $20 million (less the Relators' share), monies which are returned to the taxpayers.  In recognition of their role and the role of Counsel in securing this result and providing significant assistance in the prosecution of this matter, and to incentivize others, the United States granted Relators a significant 20% share of the award.  Of note, upon the filing of the Complaint by Relators, the United States expeditiously investigated the allegations, noticed its intent to intervene, filed a Complaint-in-Intervention and ultimately secured a significant settlement.

11.     Prior to the filing of the instant Motion, I attempted to resolve this Motion with counsel for BioTek and Gadde, including from the time of the initial settlement conference in January, 2023.  Those efforts were unsuccessful.

## I.    BACKGROUND OF THE LITIGATION[1]

### A.    Relators Allege a Complex Kickback Scheme

12.    This *qui tam* lawsuit was brought, pursuant to the FCA, by *qui tam* Relators Shantae Wyatt and Latoya Sparrow against BioTek, its CEO, Gadde, its CMO, Carla Sparkler,[2] and BioTek's sister companies, Valustar and AvasaRx.  BioTek's primary business was as a specialty infusion pharmacy that billed federally-funded insurance programs in connection with selling and administering expensive, infusion drugs and biologics.

13.    The case concerns the payment of unlawful kickbacks in violation of 31 U.S.C. §§ 3729 *et seq.*

14.    To achieve sales objectives, as alleged in the Amended Complaint ("AC"), BioTek and Gadde resorted to the unlawful sales tactics at issue in this litigation, namely paying kickbacks to physicians and inducing health care business through the unlawful waiver of Medicare cost-sharing.

15.    Specifically, the Amended Complaint alleged that the Defendants knowingly and unlawfully induced beneficiaries of federally funded health care programs to utilize BioTek's pharmacy services, and then rewarded them for such use with routine waivers of mandated federal cost-sharing obligations without regard to authenticated financial need.  These cost-sharing obligations that the Defendants were alleged to have waived were often in amounts that exceeded several thousand dollars per beneficiary.

---

[1] Sections I.A. and I.B. are set forth to summarize the principal allegations and the representation undertaken by Counsel in this Action.

[2] On February 9, 2024, the United States, Sparkler and Relators entered into a separate settlement agreement to resolve the FCA claims against Sparkler.

16.     BioTek was further alleged to have violated the AKS by paying kickbacks to physicians in exchange for the referral of beneficiaries to its pharmacies.  These kickbacks were alleged to have included providing expensive meals, entertainment and other unlawful remuneration, and also were alleged to have involved a key BioTek sales employee impersonating a medical professional in order to get insurance claims paid.

17.     As alleged in the AC, Relators, experienced medical billing professionals, raised concerns regarding the legality of these practices to Defendant Gadde, and ultimately resigned their employment in the fall of 2019.

**B.     Representation by Counsel**

18.     On December 23, 2019, KTMC filed this case under seal in the Eastern District of Pennsylvania and, on March 11, 2021, filed an Amended Complaint.  The matter remained under seal until March 31, 2021.  The Government noticed its intervention on May 3, 2021.  ECF No. 19.

19.     KTMC agreed to undertake the case entirely on a contingency basis with no guarantee that its time or out-of-pocket costs and expenses would ever be reimbursed. This was a significant undertaking that demanded the time and expense detailed herein. While all litigation undertaken on a contingent basis carries with it an inherent risk, the risks here were compounded in numerous ways.

20.     First, while the FCA is designed to incentivize the pursuit of *qui tam* recoveries for the United States, the fact remains that only a small percentage of cases are ultimately successful, and even fewer are intervened and litigated by the United States with the assistance of *qui tam* counsel.

21.     Second, the legal and factual issues presented in this matter were complex, which can increase the risk.   While FCA cases involving health care fraud are often especially

complicated because of the myriad different rules and regulations that govern coverage, payment, and reimbursement by federally-funded health care programs, demonstrating kickbacks through waiver of cost-sharing obligations can be particularly complicated and time-consuming. Moreover, the complexity of this case was further elevated because the allegations involved claims by specialty infusion pharmacies, which provide expensive drugs, biologics and infusion therapies, and are reimbursed through complicated regulations pertaining to Medicare Part B and Medicare Part D.

22. Counsel believed this case worthy of the risk and necessary resources, particularly in light of the egregiousness of the alleged conduct.

## II.   MAJOR CATEGORIES OF WORK PERFORMED BY KTMC

23. KTMC's attorneys and professional staff engaged in myriad tasks commonly undertaken in connection with complex civil litigation, including, legal research, client communications, litigation strategy sessions, document review and analysis, status conferences and settlement negotiations.

24. The following summarizes phases of work performed by KTMC's litigation team by approximate time period:

### A.   Pre-Suit Investigation and Filing of the Complaint

25. KTMC's work on this Matter commenced in August 2019 and the Firm was formally retained in September 2019. At the outset of KTMC's retention, the case was principally staffed by Asher Alavi, a senior associate at the time, Theresa DeAngelis, a junior associate, and myself. In addition, throughout the case, partner Joseph Meltzer undertook an active role overseeing the litigation team, advising on litigation and settlement strategy, and managing staffing and expenditures.

26.     The ensuing work was conducted efficiently to substantiate the allegations, draft a compelling and comprehensive Complaint, and provide the United States with the requisite disclosure of evidence that accompanies the filing of a *qui tam* lawsuit.

27.     The work performed by KTMC during this phase of the case included:

a.  Engaging in meetings and multiple telephone conferences with the Relators in order to assess and investigate the allegations.

b.  Performing legal research regarding the alleged fraud, including in connection with violations of the AKS predicated upon routine waiver of copayments and cost-sharing obligations.  In addition, Counsel researched regulatory, claims submission and reimbursement requirements for specialty infusion pharmacies under prevailing Medicare regulations and rules.

c.  Investigating the Defendants' business operations, including corporate structures, shareholders and licensure.

d.  Reviewing and analyzing documentary evidence provided by Relators, including for inclusion in disclosure to the United States.

e.  Drafting and filing a twenty-three page, four-count sealed complaint against three corporate and two individual defendants.

f.  Drafting and submitting to the United States a written disclosure of material evidence, which included a detailed description of the allegations, supporting documentary evidence, and identification of potential witnesses to the alleged fraudulent scheme.

28.     The work performed during this phase of the representation was efficient and appropriately differentiated by the seniority of the participating attorneys.

29. Specifically, the majority of the legal research and initial drafting was undertaken by Ms. DeAngelis, the most junior attorney on the litigation team. Mr. Alavi was responsible primarily for editing and revising the Complaint and Disclosure Statement, interviewing and working with the Relators, and supervising the work of Ms. DeAngelis. In addition, Mr. Alavi and I additionally collaborated in formulating the Complaint and developing the litigation strategy.

**B.      Assisting the Investigation of the United States**

30. After filing the Complaint under seal and serving the Disclosure Statement, KTMC actively assisted the United States in its investigation of the case both through and beyond the filing of the Complaint-in-Intervention on July 6, 2021.

31. This work included: (i) preparing for and representing the Relators during their interviews with the Government; (ii) preparing and submitting a supplemental disclosure statement and PowerPoint presentation to further explicate and substantiate the allegations of the Complaint; (iii) amending the Complaint to include additional information garnered during the investigation and adding Dr. Tabby as a defendant; (iv) performing substantial review of documentary evidence at the request of the United States, and providing ongoing analyses to support the Government's investigation. The work performed by KTMC is detailed below:

a.      <u>Interviews of Relators and Supplemental Disclosures</u>

32. After filing the Complaint and serving the Disclosure Statement, Counsel continued to prepare for the opportunity to meet with the United States. This primarily involved two interrelated tasks: first, preparing a PowerPoint presentation that detailed the allegations and the theories of liability, which was presented to the U.S. Attorney's Office on April 3, 2020; and second, preparing the Relators for their interviews with the U.S. Attorney's Office, which were conducted on May 1, 2020 and May 7, 2020. These meetings were lengthy.

33.     Following the interviews, KTMC prepared a supplemental disclosure for the United States, which included additional supporting documents and a list of witnesses. In addition, at the request of the United States, Counsel drafted proposed document requests for the consideration of the government in any civil investigative demands that it elected to serve.

b.      Review and Analysis of Documentary Evidence.

34.     During the second half of 2020, the United States obtained voluminous document discovery from the Defendants, comprised of hundreds of thousands of documents, electronic communications, spreadsheets and other electronic-stored materials. In order to facilitate comprehensive and efficient review, KTMC assisted the United States in conducting document review and analyses pursuant to a common-interest sharing agreement.

35.     Counsel's assistance began in December 2020, a critical juncture in the litigation, with impeding deadlines for the case to be unsealed. On December 18, 2020, KTMC executed the common-interest agreement with the United States and gained access to the repository of electronic discovery shortly thereafter, which was hosted on the Government's Relativity discovery platform.

36.     Because of the volume of the production and the manpower needed to conduct a thorough and exhaustive review, KTMC expanded the litigation team to include Anne Zaneski, a staff attorney,[3] and Eric Slifer, a contract attorney.[4] Mr. Alavi was designated to participate in and supervise the document review and analyses.

_____

[3] Staff attorneys are full-time salaried employees of KTMC receiving a full array of benefits and recognition on KTMC's website, who perform many tasks similar to those performed by associates but are not considered to be on a partnership track.

[4] The term "contract" refers to the fact that these attorneys are not full-time employees of the firm that utilizes their services. Rather, they are hired through an external staffing agency that provides attorneys for particular projects and then is paid a fixed hourly rate for each attorney that a firm such as KTMC uses. At times, KTMC's staff attorneys may be fully engaged on other matters, and the Firm retains contract attorneys to satisfy case needs without hiring

37.     The document review and analysis projects commenced at the direction of the United States in late December 2020 and continued until February 2021; after a brief pause, these projects resumed, again at the direction of the United States, in April 2021 and concluded in September 2021.

38.     During this time period, Counsel was in regular communication with the U.S. Attorney's Office, who monitored each stage of the document review projects. Per the directions of the U.S. Attorney's Office, KTMC focused on key areas of inquiry and recorded results in a coding panel, provided by the Government, that was tailored to specific allegations in the Complaint.

39.     The work was not merely a first-level, document-by-document review for relevancy, but rather, a much more detailed and sophisticated review that was focused on supporting the Government's investigation. Searches were targeted; documents and spreadsheets were efficiently analyzed and recorded in the Government's coding panel; and summaries of analyses were prepared and regularly sent to the U.S. Attorney's Office, often on a daily basis. In addition, the attorneys drafted detailed memoranda in connection with certain highly relevant areas of inquiry.

40.     The range of assigned projects included extracting critical information necessary to establish violations of the FCA and the AKS, which required a thorough understanding of the legal and factual bases of the claims. The complexity of this work was compounded by the regular use of medical terms, drug and disease names, and other specialized terminology that required specialized understanding and analysis.

---

additional full-time employees. This practice developed to fill a need in the legal profession as cases became more document intensive.

41.     Mr. Alavi bore primary responsibility for supervising the work of Ms. Zaneski and Mr. Slifer, including by creating review batches based on keyword searches, performing additional review of key documents, and discussing case theories and assignments with Ms. Zaneski and Mr. Slifer during regular communication.

42.     During this period, Mr. Alavi and I were in regular contact with the U.S. Attorney's Office, provided detailed summaries of the work that was being performed, and otherwise endeavored to support the Government's investigation as requested.

43.     The work on these projects comprised the largest single component of attorney time expended by KTMC in this representation, with Ms. Zaneski and Mr. Slifer accounting for the vast majority of that time on analysis of the sizeable documentary record. I believe the information derived from these efforts was critical to the pursuit of these claims, the filing of the Complaint-in-Intervention, and resolution through the Settlement.

44.     KTMC staffed this effort based on the particular needs of the case and the timing of the document productions received by the United States. Thus, upon gaining access to the first productions, and between January and February 24, 2021, the entire litigation team[5] – myself, along with Mr. Alavi, Ms. Zaneski and Mr. Slifer - devoted significant time to the review and analysis efforts. At the direction of the Government, review then ceased for a period of time, until April 7, 2021, when KTMC was again tasked with working on reviews requested by the Government. In the ensuing months, staffing and time commitments fluctuated, based upon the particular needs of the case as identified by the Government.

45.     Based, among other things, upon my conversations with the Assistant U.S. Attorneys assigned to this matter; the facts that were alleged in the Complaint-in-Intervention; and

---

[5] Ms. DeAngelis left her position at the Firm at the end of December, 2020.

the significant Relators' share awarded to our clients, I believe the results of this work to have been of great assistance to the United States.

46.     During the months of February and March 2021, KTMC additionally expended efforts drafting an Amended Complaint.  The Amended Complaint, filed on March 11, 2021, expanded Relators' kickback allegations, including by naming Dr. David Tabby as a defendant,[6] and by detailing the provision of free administrative services and entertainment to physicians as a means of inducing referrals.  ECF No. 14.

47.     Overall, I believe that the work performed during this phase of the representation was also efficiently and appropriately designated, with the least expensive attorneys accounting for the majority of the hours worked in connection with the document review and analysis projects performed at the request of the United States.

**C.      Government Intervention and Stay of Proceedings**

48.     While KTMC continued to work on the document review projects at the direction of the United States, on May 3, 2021, the Government filed its notice of intervention.  On July 6, 2021, the United States filed it Complaint in Intervention, which included claims against Defendants BioTek and Gadde predicated on violations of the AKS.

49.     On July 9, 2021, the parties filed a joint motion to refer the case to a Magistrate Judge, which was granted on July 12, 2021.  The case was subsequently stayed while the parties engaged in the early stages of settlement discussions and otherwise exchanged information about their respective positions.

---

[6] Dr. Tabby was alleged to be the recipient of kickback payments from BioTek, and resolved the claims against him by settlement with the United States. Separately, Relators resolved their claim for reasonable expenses, attorneys' fees, and costs against Tabby pursuant to 31 U.S.C. § 3730(d). Time expended solely related to Dr. Tabby, including on the settlement of the claims brought against him, has been excluded from this fee motion.

50.     During this period, KTMC participated in the various scheduling and status conferences, reviewed joint status reports and motions to extend the stay, communicated with the Relators, and additionally continued to communicate regularly with the United States.

51.     At the direction of the Government, KTMC also continued to conduct extensive document review and analyses in support of the litigation and its potential resolution, with particular attention to the defenses proffered by the Defendants, including the purported inability to satisfy the full quantum of damages asserted by the Government.  These projects involved the difficult task of analyzing corporate revenue, accounts and financial information, including the connections between various corporate entities and their respective financial conditions.  In addition, KTMC conducted targeted analyses regarding individual liability and otherwise responded to requests from the United States as they arose, while continuing to adduce evidence of liability on multiple aspects of the case at the direction of the Government.

52.     The majority of work performed during this phase of the litigation was performed by Ms. Zaneski and Mr. Slifer, under the supervision and direction of Mr. Alavi, in connection with the specific document review and analysis projects performed at the request of the United States.

**D.      Efforts at Resolution through Mediation and Settlement Conferences**

53.     KTMC expended significant time attempting to resolve these claims through settlement conferences and communications directly with both the United States and Defendants.

54.     The principal settlement conference was held on January 4, 2023 before Judge Strawbridge.  In advance, KTMC conferred with the Government and otherwise prepared to

participate in settlement negotiations. The settlement conference consumed a full-day[7] and resulted in a settlement in principle between the United States, the Defendants, and the Relators.

55.     After the settlement in principle was reached, Mr. Alavi and I worked closely with the Government to review and edit the Settlement Agreement, negotiated key terms with the United States and the Defendants, participated in calls with HHS-OIG pertaining to the Corporate Integrity Agreement, and worked on the documents necessary for dismissal. The Settlement Agreement was edited extensively by the parties over the course of nearly nine months, which required substantial additional research, drafting and negotiation. During this time, Counsel continued to communicate regularly with Relators.

56.     Counsel also began to work on preparing the materials necessary to support a motion for attorneys' fees. Pre-filing attempts to resolve this matter by settlement were not successful.

57.     On September 29, 2023, the parties executed the Settlement Agreement. *See* Exhibit A.

58.     In recognition of this sizeable Settlement and the contributions of the Relators and Counsel, the United States agreed to a Relator's share award of 20%. Based on my experience, I believe this to be a significant award and exercise of the Government's discretion towards Relators.

III.     **KTMC'S REASONABLE FEES, COSTS AND EXPENSES**

59.     The United States and Relators secured this $20 million Settlement only after Counsel spent more than four years working on this important case. Doing so necessitated over

---

[7] KTMC was represented at the conference by Joseph Meltzer and Mr. Alavi. Because I was ill and unable to attend in person, I participated by conferring with my colleagues and with the U.S. Attorney's Office by telephone periodically throughout the day.

2,400 attorney and legal support hours, and expenses that were incurred without any assurance of a recovery. In total, KTMC is seeking reimbursement for (i) $1,229,587.50 in attorneys' fees, which represents the lodestar calculation of 2,411.80 hours in attorney and legal support time multiplied by the applicable hourly rates[8] through February 29, 2024[9] and $4,541.56 in case expenses. Included within this total are 103.9 hours, representing a lodestar of $85,356.50 incurred in connection with this fee dispute through February 29, 2024. The detailed records supporting Relator's reasonable expenses, attorneys' fees and costs, described more fully below, are attached as Exhibits B and C.

60.     I believe that the time reflected in Counsel's lodestar calculation and the costs and expenses for which payment is sought as stated in this Declaration are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation.

A.     **KTMC Background**

61.     KTMC is a plaintiffs-side law firm, specializing in complex civil litigation, with approximately 90 lawyers between its offices in Radnor, Pennsylvania and San Francisco, California. KTMC handles a wide-range of matters, with dedicated practice groups focusing on securities class action litigation, antitrust and consumer litigation, corporate governance and mergers and acquisitions litigation, and whistleblower representation. KTMC has earned national

---

[8] KTMC has applied its customary rates for 2024, reflecting the year that this motion was filed. For attorneys and professional support staff employees who were no longer employed by KTMC as of 2024, the hourly rate used is the hourly rate for such employee in the final year of the employee's work on the case.

[9] In the exercise of billing judgment, KTMC has limited this fee petition to include time incurred by KTMC professionals on non-fee related work through February 29, 2024, notwithstanding that additional time was expended thereafter on settlement and other tasks unrelated to this motion. KTMC reserves the right to augment this petition to account for time spent on the preparation and litigation of this motion after February 29, 2024.

and international recognition, and has achieved success in courts throughout the United States and abroad.[10]

62.     With respect to securities litigation, KTMC has recovered billions of dollars in the course of representing defrauded shareholders from around the world, and is serving or has served as lead or co-lead counsel in many of the largest and most significant securities class actions pending in the United States, including actions against: Bank of America, Duke Energy, Lehman Brothers, Hewlett Packard, Johnson & Johnson, JPMorgan Chase, Wells Fargo, MGM Mirage, Walgreen, Kraft Heinz, Goldman Sachs, General Electric, and Rivian, among others.

63.     KTMC's whistleblower practice has been staffed principally by myself and Asher Alavi and, at various times, one or two additional associates. The practice has achieved notable results representing whistleblowers in *qui tam* and other whistleblower matters. Currently, KTMC represents whistleblowers in numerous matters that are either under seal or otherwise remain confidential.  Previously, KTMC's whistleblower practice has successfully represented clients in the following unsealed cases involving: pharmaceutical marketing, *see U.S. ex rel. Simpson v. Bayer Corp.,* No. 05-cv-3895 (D.N.J.) (kickbacks and unlawful off-label promotion); pharmaceutical sales to government agencies, *see U.S. ex rel. Simpson v. Bayer Healthcare Pharmaceuticals, Inc*., No. 08-cv-5758 (D. Minn.) (fraudulent inducement of government contracts); neurodiagnostic testing, *see United States ex rel. Doe v. Alliance Family of Companies, LLC, et al.*, No. 4:19-cv-01213 (S.D. Tex.) (kickbacks and medical necessity fraud); specialty pharmaceutical compounding, *see United States ex rel. Brasher v. Pentec Health, Inc.*, No. 13-cv-05745 (E.D. Pa.) (kickbacks and waivers of routine cost-sharing); home sleep testing, *see United States ex rel. Piacentile v. SNAP Diagnostics, LLC, et al.*, No. 1:14-cv-03988 (N.D. Ill.) (kickbacks

---

[10] *See* https://www.ktmc.com/achievements/awards

and medical necessity); and diagnostic imaging, *see United States ex rel. Solano v. Diagnostic Imaging Group LLC, et al.*, No. 10-cv-00267 (D.N.J.) (kickbacks).

64.     The whistleblower practice employs a model that is integrated with KTMC's broader litigation practice groups. Thus, for whistleblower matters that require additional resources, KTMC assigns attorneys from other departments with subject matter expertise or experience pertaining to the particular case.

65.     KTMC has amassed extensive experience prosecuting cases involving health care, including against pharmaceutical companies, medical device companies, pharmacies, and other participants in the life sciences industry. Indeed, pharmaceutical and health care litigation represents one of the largest facets of KTMC's historic and current caseload. Beyond my whistleblower cases, I am presently counsel of record in the following active health care securities litigation matters: *City of Warwick Retirement Sys. v. Catalent, Inc.*, No. 23-cv-01108 (D.N.J.)(cGMP compliance); *In re Mylan N.A. Securities Litigation*, No. 2:20-cv-00955 (W.D. Pa.)(cGMP compliance regarding generic drug manufacturing) and was counsel of record in *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Company, et al.*, No. 2:20-cv-002155 (D.N.J.) (medical device safety and compliance with FDA regulations), which recently settled, and *Washtenaw County Employees' Retirement System v. Walgreen Company, et al.*, No. 1:15-cv-3187 (N.D. Ill.) (generic drug pricing and reimbursement rates), which settled in 2023. KTMC's active docket includes numerous other health care and pharmaceutical cases. *See, e.g.*, *In re Celgene Corporation, Inc. Securities Litigation*, No. 2:18-cv-04772 (D.N.J.) (compliance with FDA new drug application standards).

66.     During its nearly 35-year history, KTMC has taken a leadership role in more than 60 complex cases that involved a health care, pharmaceutical, medical device or life sciences

company as a primary defendant. Those matters include: *In re Pfizer Inc. Securities Litigation*, No. 1:04-cv-09866 (LTS) (HBP) (S.D.N.Y.) (alleged misrepresentations of drug safety and efficacy); *Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al.*, No. 0:08-cv-06324-PAM-AJB (D. Minn.) (alleged off-label promotion); *In re Loestrin 24 FE Antitrust Litigation*, No. 13-md-2472 (D.R.I.) (alleged delay in generic drug introduction); *In re Allergan Generic Drug Pricing Securities Litigation*, No. 2:16-cv-9449 (KSH) (D.N.J) (alleged generic drug price fixing); *In re Flonase Antitrust Litigation,* Nos. 2:08-cv-3149 & 08-3301 (E.D. Pa.) (alleged delay in generic introduction).

### B. Case Staffing

67.     KTMC principally staffed this matter with the following attorneys: David Bocian (partner); Asher Alavi (counsel); Theresa DeAngelis (associate); Anne Zaneski (staff attorney) and Eric Slifer (contract attorney), as well as with other legal professionals.

68.     Exhibit D provides the identity of the principal professionals who have rendered service for which KTMC seeks an award of attorneys' fees, and a brief description of each person's professional experience.

69.     During KTMC's representation, the partners assigned to this matter, and others, regularly discussed case management and staffing, which was modulated based on the particular needs of the case.

70.     Throughout the matter, I was the primary partner assigned to litigate the case and manage daily litigation tasks.

71.     Mr. Alavi was the primary associate (and later counsel) on the case, and collectively worked on all aspects of the litigation through resolution. Until her departure from the Firm at the end of 2020, Theresa DeAngelis was assigned as a junior associate and assisted with various litigation tasks and discovery projects that were commensurate with her experience.

72.     Ms. Zaneski worked on document review and analysis projects, and drafted memoranda regarding key issues which were used to provide analysis to the U.S. Attorney's Office.

73.     Eric Slifer, a contract attorney, was retained to work on the document review and analysis, based upon an assessment of the significant challenges involved in reviewing and analyzing the electronic discovery record, and because KTMC required additional resources to conduct the document analysis requested by the United States and necessitated by the complexity of the matter.[11]

74.     Over the course of the litigation, the number of attorneys assigned to the case varied depending on the specific litigation needs at the time. The number of hours billed similarly fluctuated based on the needs of the case.

**C.     Lodestar**

75.     The schedule attached as Exhibit B is a detailed daily time report for KTMC attorneys and legal professionals for whom an award of fees is sought by this Motion, and the lodestar based upon 2024 hourly rates except where otherwise indicated. Exhibit B was prepared, at my request, from contemporaneous daily time records regularly prepared and maintained by KTMC.[12]

---

[11] KTMC's contract attorneys are assigned a firm email address like all KTMC employees, are provided access credentials to the electronic discovery platform, and post-pandemic, primarily work remotely. Throughout his work on the case, Mr. Slifer was supervised by full-time KTMC attorneys, which included regular remote meetings with Mr. Alavi, and ongoing communications via telephone and email.

[12] For purpose of preparing this fee Motion, under my supervision, minor edits were made to daily time descriptions within Exhibit B to correct spelling, grammatical, abbreviation, and other typographical errors. References to travel have been deleted for those entries where corresponding travel time was deducted. Certain descriptions have also been redacted to preserve attorney-client and common-interest privileges.

76.     I oversaw review of KTMC's contemporaneous time entries for this matter and I have exercised reasonable billing judgment to reduce or eliminate certain billing entries from the lodestar.

77.     In addition, KTMC attorneys routinely exercised billing judgment before recording time, as it was both my regular practice, and the practice of other KTMC attorneys assigned to the case, not to enter time or to reduce time related to, for example, brief inter-office communications and consultations.

78.     This reduction includes (i) broadly eliminating time connected to Relators' claims against Defendant Tabby; (ii) eliminating time attributable to the settlement with Defendant Sparkler; and (iii) otherwise eliminating or reducing time based on review of the individual time entries.

79.     Specifically, KTMC has exercised billing discretion for time spent conducting document review and analysis between April and June 2021 related to documents produced by Defendant Tabby.  While these documents were relevant to establishing the liability of both Dr. Tabby and the BioTek Defendants, KTMC has exercised its billing discretion notwithstanding that the BioTek Defendants are jointly and severally liable for any amounts not paid by Dr. Tabby. This reduction alone excludes 377.6 hours and $151,420.50 in lodestar.

80.     I have also exercised my discretion to eliminate small amounts of time dedicated solely to travel. In addition, I have also exercised billing judgment by reducing or eliminating certain time entries.

81.     Included in Exhibit B are 103.9 hours recorded in connection with Relators' claim for statutory attorneys' fees, costs and expenses through February 29, 2024, including time related to preparing this Motion and supporting documents. For purposes of this Motion, KTMC has

included a column labeled "Fees" to Exhibit B, and has designated time entries which relate to Relators' claims for statutory attorneys' fees with an "x". This amounts to $85,356.50 in lodestar.

82. Table A below was prepared from the daily time report attached as Exhibit B. Table A summarizes the lodestar of KTMC personnel and lists the timekeeper, position, billing time period, hourly rate, total hours, and lodestar.

| TABLE A | | | | | |
|---------|--------|------------------------|-----------|----------|---------------|
| Name | Position | Billing Period (MM/YY) | Rate/Hour | Hours | Lodestar |
| Bocian, D. | Partner | 08/19 – 02/24 | $1,195 | 149.30 | $178,413.50 |
| Meltzer, J. | Partner | 01/23 – 01/23 | $1,195 | 9.3 | $11,113.50 |
| Alavi, A. | Counsel | 01/22 – 02/24 | $750 | 281.1 | $210,825.00 |
|  | Associate | 08/19 – 11/21 | $525 | 263.9 | $138,547.50 |
| DeAngelis, T. | Associate | 09/18 – 12/20 | $400 | 244.9 | $97,960.00 |
| Zaneski, A. | Staff Atty | 12/20 – 09/21 | $455 | 731.1 | $332,650.50 |
| Slifer, E. | Contract Atty | 12/20 – 02/21 06/21 – 09/21 | $350 | 707.0 | $247,450.00 |
| Hemsley, C. | Paralegal | 06/21 – 06/21 | $405 | 0.3 | $121.50 |
| Wotring, J. | Paralegal | 12/19 – 12/19 | $320 | 1.5 | $480.00 |
| Jeffrey, C. | Investigations | 09/19- 09/19 | $300 | 1.0 | $300.00 |
| Maginnis, J. | Investigations | 09/22- 09/22 | $400 | 6.8 | $2,720.00 |
| Molina, H. | Investigations | 04/21- 04/21 | $400 | 0.5 | $200.00 |
| Monks, W. | Investigations | ^various | $660 | 11.1 | $7,326.00 |
| Righter, C. | Investigations | 04/21- 04/21 | $370 | 4.0 | $1,480.00 |
| TOTAL | | | | 2,411.80 | $1,229,587.50 |

83. The hourly rates included herein are the same as, or comparable to, the rates submitted by KTMC in other FCA cases for work performed during this time period and/or accepted by courts in other contingent complex litigation and class actions, for purposes of "cross-checking" lodestar against a proposed fee based on the percentage fee method, as well as determining a reasonable fee under the lodestar method.

84. Overall, KTMC's rates are largely based upon a combination of the title and the specific years of experience for each employee, as well as periodic analyses of internal costs, rates

used by plaintiff's firms performing comparable work, and rates of defense firms in our cases. These rates have consistently been approved by courts throughout the country. Different timekeepers within the same employment category (e.g., partners, associates, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, cost to the firm, and the rates of similarly experienced peers at KTMC and/or other plaintiff's or defense firms.

85.     I have also included calculation of KTMC's blended hourly attorney rate in Table B. Table B also sets forth the percentage of the total hours recorded by each timekeeper category. This blended rate is in line with or below the blended rates that KTMC has billed and recovered in other large, complex litigation.

| TABLE B | | | |
|---|---|---|---|
| **Position** | **Total Hours (%)** | **Blended Rate** | **Total Lodestar (%)** |
| Partners | 158.6 (6.65%) | $1,195.00 | $189,527.00 (15.57%) |
| Counsel / Associates | 789.9 (33.1%) | $566.32 | $447,332.50 (36.76%) |
| Staff / Contract | 1438.1 (60.26%) | $403.38 | $580,100.50 (47.67%) |
| **All Attorneys** | **2,386.6** | **$509.91** | **$1,216,960.00** |

86.     The distribution set forth in Table B above demonstrates the appropriate and efficient allocation of tasks among the litigation team, with more junior personnel expending substantially more time than the more senior members of the litigation team.

87.     Overall, the attorneys with the lowest hourly rates (contract and staff attorneys) accounted for roughly 60% of the total hours and nearly 48% of the lodestar. These hours were incurred in connection with the most time-intensive work necessitated by the complexity of this case—specifically, the critically important document review and analysis projects that were performed at the request of the United States.

**D. Costs and Expenses**

88. KTMC amassed a total of $4,541.56 in unreimbursed costs and expenses prosecuting this matter. These costs and expenses, which are reported separately and are not duplicated in the firm's hourly rates, are reflected in KTMC's books and records, which are prepared in the normal course of business by KTMC and are an accurate record of the expenses incurred in the prosecution of this matter. Attached as Exhibit C is a report created from contemporaneous expense records prepared and maintained by KTMC in the normal course of business. I have exercised billing judgment and excluded certain costs and expenses from Exhibit C. KTMC's costs and expenses are set forth in Table C below:

| TABLE C | |
| --- | --- |
| **Category** | **Amount** |
| Copies In-house | $91.80 |
| Filing Fees | $400.00 |
| Legal Research | $3,780.86 |
| Travel, Food and Lodging | $268.90 |
| **TOTAL** | **$4,541.56** |

89. These expenses and costs are the types of expenses that are necessarily incurred in complex civil litigation and that law firms routinely charge to clients who are billed on an hourly basis. Despite the risk this litigation entailed, KTMC seeks no multiplier or interest on that invested capital.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 30, 2024.

*/s/ David Bocian*
David Bocian